**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRIDGET MCMULLAN, | : | |
| 2742 Welshtown Road | : | |
| Slatington, PA 18080, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. _____ |
| | : | |
| v. | : Jury Trial Demanded Pursuant to | |
| | : F.R.Civ.P. No 38(b) | |
| IMG CORPORATIONS, INC. aka | : | |
| IMARKET GLOBAL INC. aka IMG CORP. | : | |
| SUMMIT ENERGY, INC.; SFE ENERGY | : | |
| INC.; SFE ENERGY CANADA INC.; | : | |
| SFE ENERGY PENNSYLVANIA, | : | |
| INC. aka SFE ENERGY; | : | |
| JEREMY BLAND; JOHN DOE | : | |
| CORPORATION #1, JOHN DOE | : | |
| CORPORATION #2, JOHN DOE | : | |
| CORPORATION #3, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**

## I.    INTRODUCTION

1.    Plaintiff, Bridget McMullan (hereinafter "Plaintiff" or "Ms. McMullan"), brings this action against her former employer IMG Corporations, Inc. ("IMG"), SFE Energy Pennsylvania, Inc. aka SFE Energy and related entities (collectively referred to as "SFE") and her supervisor Jeremy Bland ("Bland") (collectively "Defendants") for unlawful employment practices, including sexual harassment, hostile work environment, retaliation, and constructive discharge, in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Pennsylvania Human Relations Act ("PHRA"), as well as related state law claims.

1

2.      Upon information and belief, SFE Energy conducts their sales operations through a corporate entity using the name "iMarket Global Inc." aka IMG Corporations Inc. aka IMG Corp. (hereinafter, collectively referred to as "IMG") which acts as cover for their marketing, recruitment, and sales. Notably, there is no readily identifiable record anywhere of these IMG entities active and existing anywhere in Canada, or Pennsylvania. All phone numbers found online affiliated with IMG Corporations, Inc. online are disconnected or lead to unrelated businesses. IMG Corporations, Inc. and IMG Corp. are registered in New York with the same address of 1129 NORTHERN BLVD , SUITE 404, MANHASSET, NY, UNITED STATES, 11030; upon further inquiry it appears that this is a Regus shared office workspace shared by a law office and insurance agency. These entities are utilized to solicit customers, recruit workers, and carry out day-to-day sales operations on behalf of SFE Energy and these sales people report to SFE Energy employees.

3.      Plaintiff was recruited to perform administrative services for recruiting sales representatives as part of Defendants' energy business scheme and entered into an agreement with Defendants governing her work, compensation, and responsibilities. Plaintiffs performed under these agreements by recruiting sales representatives and generating business for Defendants.

4.      Defendant IMG Corporation ("IMG") is not an independent enterprise, but rather functions as an integral component of a coordinated multi-level marketing scheme devised, controlled, and implemented by Defendant SFE Energy and its affiliated entities (collectively, "SFE"). Upon information and belief, IMG exists primarily as a recruitment and front-facing vehicle through which SFE expands its sales force while obscuring its direct involvement in the hiring, training, and supervision of sales representatives. Individuals recruited through IMG are led to believe they are joining a distinct business opportunity, when in reality they are funneled into SFE's sales structure, trained by SFE personnel, and directed to sell SFE energy contracts to

2

consumers. This layered corporate structure—utilizing IMG as a nominally separate entity—has the purpose and effect of concealing the true identity of the controlling enterprise, evading regulatory scrutiny, and insulating SFE from liability arising from its deceptive recruitment practices and unlawful sales conduct, thereby misleading both recruits and consumers as to the nature, ownership, and operation of the business.

5.    Upon information and belief, Defendants intentionally structured their operations through entities such as IMG in order to obscure the contractual relationships, avoid direct liability, and create confusion as to which entity was responsible for Plaintiffs' compensation. In reality, SFE Energy exercised control over the underlying business operations and directly benefited from Plaintiffs' work. Furthermore, upon information and belief, each entity has overlapping ownership and overlapping executive officers.

6.    Defendants subjected Plaintiff to harassment and discrimination on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2, *et seq.* (hereinafter "Title VII"), and of the Pennsylvania Human Relations Act, as amended, 43 P.S. §§ 951, *et seq.* (hereinafter the "PHRA").

7.    Defendants subjected Plaintiff to severe, pervasive, and escalating sexual harassment, including sexual assault, and failed to take appropriate remedial action despite having actual knowledge of the misconduct. When Plaintiff resisted and complained, she was retaliated against and ultimately forced out of her employment.

8.    As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages and relief brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*, the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951 *et seq.*, Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law and various State tort claims

arising from Defendants' discrimination, retaliation, hostile work environment, and other violations against Plaintiff on the basis of her sex.

## II.    PARTIES

9.    Plaintiff, Bridget McMullan is an adult individual and citizen of the Commonwealth of Pennsylvania who currently resides in Lehigh County, Pennsylvania.

10.    Defendant IMG Corporations, Inc. also known as iMarket Global, Inc. iMarket Global, IMG Inc., IMG Corp. and IMG (hereinafter, collectively referred to as "IMG") is a purported business entity that, at all times relevant hereto, provides marketing and branding services, with offices in *inter alia* Oakland, California and Allentown, Pennsylvania, that employed Plaintiff and, upon information and belief, employed more than fifteen employees at all relevant times.

11.    Defendant SFE Energy, also known as Summit Energy, Inc., SFE Energy Canada, Inc., SFE Energy, Inc. and SFE Energy Pennsylvania, Inc. (hereinafter collectively "SFE"), is an energy services company that conducts business throughout the United States, including within the Commonwealth of Pennsylvania. Defendant SFE holds itself out as an energy services company engaged in the business of supplying natural gas and/or electricity to residential consumers; however, in reality, SFE operates as a third-party energy broker that does not generate or deliver energy, but instead profits by enrolling customers into supply contracts with local utilities through an extensive, decentralized sales network.

12.    Upon information and belief, SFE relies heavily on door-to-door and in-person solicitation conducted by commission-based sales representatives and affiliated entities, who are trained and directed to secure customer enrollments through high-pressure sales tactics. Numerous consumer complaints and public reports reflect that SFE's representatives engage in problematic

and possibly deceptive business practices. See, e.g. *Consumer Warning: Reps from "Shady" Gas Company Are Going Door-to-Door*, Lost Coast Outpost (Apr. 17, 2024), https://lostcoastoutpost.com/2024/apr/17/consumer-warning-reps-shady-gas-company-are-going/; *Rafael Fuentes v. SFE Energy Massachusetts, Inc.*, Greater Boston Legal Services, https://www.gbls.org/rafael-fuentes-v-sfe-energy-massachusetts-inc (last visited May 1, 2026); *SFE Energy Pennsylvania, Inc. – 2016 PUC Complaints*, PA Energy Ratings, https://www.paenergyratings.com/puc-complaints/sfe-energy-pennsylvania-inc/2016 (last visited May 1, 2026).

13. Further, upon information and belief, SFE structures its sales operations through layers of affiliated or related entities and independent contractors, thereby obscuring the true nature of its business operations and attempting to insulate itself from liability arising from the conduct of its sales force. This business model, which emphasizes aggressive solicitation, commission-based compensation, and the use of intermediary entities to recruit and manage sales personnel, operates in a manner akin to a multi-level or direct sales organization, prioritizing rapid customer acquisition over transparency and consumer protection, and has generated widespread complaints alleging deceptive and misleading business practices.

14. Defendant Jeremy Bland is an adult individual who, at all relevant times, was employed in a supervisory and managerial capacity for SFE Energy over Plaintiff and acted within the scope of his employment.

15. Defendant SFE Energy operates under numerous names, aliases, and corporate designations (for example, SFE Energy, Family Energy, Statewise Energy, Summit Energy, IMG etc.), often using such names interchangeably and without regard to corporate separateness. At all

5

times relevant hereto, Defendants conducted business under the following names, including but not limited to:

- SFE Energy
- SFE Energy LLC
- SFE Energy Company
- SFE
- Summit Family Energy
- Summit Family Energy LLC
- Summit Family
- Family Energy, Inc.
- Family Energy
- Family Energy Inc.
- Family Energy Services
- Family Energy (ESCO)
- iMarket Global Inc.
- iMarket Global
- iMarketGlobal Inc
- IMG Corporation
- IMG Corporations, Inc.
- IMG Corp
- IMG

16.    Defendants used the foregoing names and designations interchangeably in connection with their business operations, including but not limited to recruiting, hiring, supervising, and compensating workers, as well as marketing and selling energy services to customers. Upon information and belief, these names do not reflect distinct and independent corporate entities, but rather are part of a single, integrated enterprise operating under common ownership, management, and control.

17.    At all times relevant hereto, it is believed and therefore averred that Defendants IMG and SFE, together with their various aliases, affiliated entities, and related business names, operated as a single, integrated enterprise with common ownership, management, control, and business purpose.

6

18.    Upon information and belief, Defendants deliberately utilized multiple corporate names, aliases, and nominal entities interchangeably, including but not limited to those identified above, in order to:

  a.  recruit employees and independent contractors;

  b.  conduct sales operations;

  c.  obscure the identity of the true employing entity; and

  d.  evade legal and regulatory accountability.

19.    At all relevant times, Defendants shared common management, including overlapping executives and supervisory personnel, centralized control of labor relations, and interrelated operations.

20.    Upon information and belief, Defendants jointly controlled the terms and conditions of Plaintiff's employment, including hiring, supervision, discipline, and termination, and therefore acted as joint employers and/or a single employer under applicable law.

21.    Upon information and belief, Defendants jointly controlled the terms and conditions of Plaintiff's employment, including hiring, supervision, discipline, and termination, and therefore acted as joint employers and/or a single integrated employer under applicable law. In the alternative[1], to the extent any Defendant is determined not to be part of a single integrated enterprise, each such Defendant nevertheless exercised sufficient control over Plaintiff's employment to qualify independently as her "employer" within the meaning of Title VII and the PHRA, either directly or through agents. Accordingly, each Defendant is liable individually and/or

---

[1] It is well-settled that under the Federal Rules of Civil Procedure, "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically," Fed. R. Civ. P. 8(d)(1), and that "[a] party may state as many separate claims ... as it has, regardless of consistency," Fed. R. Civ. P. 8(d)(3). *See also TriState HVAC Equip., LLP v. Big Belly Solar, Inc.*, 836 F. Supp. 2d 274, 289 (E.D. Pa. 2011) ("Rule 8(d) allows a plaintiff to plead alternative theories of relief, even if those theories are inconsistent.").

jointly and severally for the unlawful conduct alleged herein. In further alternative, Defendants acted as agents of one another and/or delegated supervisory authority among affiliated entities, such that the unlawful conduct described herein was committed within the scope of such agency relationships and with the apparent authority conferred by each Defendant.

22.    At all times relevant hereto, Defendants, individually and/or collectively as a single integrated enterprise and/or joint employer, employed fifteen (15) or more employees in the current and/or preceding calendar year, and are therefore "employers" within the meaning of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA").

23.    Upon information and belief, Defendants maintained a workforce that meets or exceeds the statutory threshold for coverage under Title VII, including employees operating across multiple locations and through affiliated entities. Defendants' employees were subject to centralized control of labor relations, common management, and interrelated operations.

## III.    JURISDICTION AND VENUE

24.    Because this case is brought under Title VII, 42 U.S.C. §§ 2000e-2, et seq., this Court has federal question jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 (a)(4).

25.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to these claims occurred within the Eastern District of Pennsylvania; furthermore, the Defendant is subject to personal jurisdiction in this District, it "resides" in this District for venue purposes, see 28 U.S.C. § 1391(c)(2); therefore, venue is proper in the Eastern District of Pennsylvania because Defendant resides within this District. See 28 U.S.C. §§ 1391(b)(1).

26.    On or about October 7, 2024, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") complaining of acts of discrimination

alleged herein. This Charge was cross-filed with the Pennsylvania Human Relations Commission ("PHRC"). Attached hereto, incorporated herein, and marked as Exhibit 1 is a true and correct copy of the EEOC Charge of Discrimination (with personal identifying information redacted).

27.   On or about February 3, 2026, the EEOC issued Plaintiff a Notice of Rights. Attached hereto, incorporated herein, and marked as Exhibit 2 is a true and correct copy of that Notice (with personal identifying information redacted).

28.   Plaintiff has fully complied with all administrative prerequisites for the commencement of this action and has exhausted her administrative remedies.

## IV.   FACTS

### a.   The SFE Energy and IMG Multi-Level Marketing Scheme.

29.   Defendant SFE Energy is an entity engaged in the business of marketing and selling retail energy services to consumers in deregulated markets, including within the Commonwealth of Pennsylvania.

30.   Defendant is an "energy services company" that does not generate or physically deliver energy to consumers, but instead procures customers and sells energy supply contracts which are fulfilled through existing public utilities.

31.   The local utility companies are responsible for the actual transmission and delivery of energy, as well as the billing of customers, including both the utility's delivery charges and Defendant's separate supply charges.

32.   Accordingly, Defendants function primarily as a broker, marketer, and trader of energy commodities, deriving revenue from the procurement and enrollment of customers into energy supply agreements.

9

33.     Upon information and belief, at all relevant times, Edwin Grichanik has served in a senior executive capacity, including as Chief Executive Officer, for SFE Energy, and has also been identified as holding a leadership role with Family Energy and IMG.

34.     At all times relevant hereto, Edwin Grichanik held himself out to contractors, employees, and other third parties as the owner and principal decision-maker of both SFE and IMG, exercising authority and control over their operations. Upon information and belief, Mr. Grichanik routinely identified himself as the head of both entities in business dealings and communications, thereby creating the reasonable impression that he possessed ownership and managerial authority over each.

35.     Plaintiff was recruited into a purported sales organization operating under the name "IMG Corporations" (hereinafter "IMG").

36.     During the recruitment and onboarding process, Plaintiff was expressly informed that IMG Corporations was a legitimate business entity engaged in the marketing and sale of energy services, and that Plaintiff would perform sales work through IMG.

37.     Plaintiff was further informed that the Chief Executive Officer or controlling figure of IMG was Edwin Grichanik, the same individual identified with SFE Energy.

38.     Furthermore, one of the managers Plaintiff reported to was Jeremy Bland, who worked for SFE Energy.

39.     Individuals recruited by IMG were classified as independent contractors and were compensated exclusively on a commission basis tied to the sale of energy service contracts.

40.     Plaintiff was recruited into this system through the entity identified as IMG Corporations and was led to believe that she would be working for a legitimate and established company.

41.    Plaintiff was hired as an administrator to coordinate and assists with recruiting sales people for the business.

42.    These sales efforts were directed toward enrolling customers into energy supply agreements associated with SFE Energy, Family Energy, and Statewise Energy.

43.    Defendants implemented and maintained a recruitment process whereby prospective applicants were solicited through advertisements and communications representing that they were being considered for an administrative position with IMG, purportedly offering compensation of approximately $800 per week. Individuals responding to these representations were scheduled for initial interviews and were not informed, at that time, that the advertised IMG position was unavailable or that the recruitment process was intended to channel candidates into a different role.

44.    Plaintiff was employed by the Defendants in a role that included coordinating interviews with prospective applicants and conducting follow-up communications to ensure attendance at scheduled interviews. In the course of her duties, Plaintiff scheduled first-round interviews for individuals who had responded to the IMG job advertisements and communicated with such individuals regarding interview logistics. Plaintiff's responsibilities also included contacting candidates after initial interviews to arrange second interviews, at which point SFE personnel would inform candidates that no positions with IMG were available and instead present an opportunity to work for SFE as a commission-based sales representative.

45.    Through this two-step interview process, SFE caused candidates to attend interviews under the belief that they were being considered for a salaried administrative position with IMG, only to later be presented with a materially different position with SFE that was commission-based and sales-oriented. Plaintiff, while not personally misled as to the nature of

11

SFE's recruitment practices, was required as part of her employment to facilitate and support this process by coordinating interviews and maintaining communications with prospective applicants.

46.    Despite IMG being presented as a standalone company, Plaintiff is unaware of any legitimate corporate registration, formal organizational structure, or publicly verifiable business filings for "IMG Corporations" other than in New York under the name "IMG Inc." and "IMG Corp."

47.    Upon information and belief, Defendant SFE Energy conducts certain of its sales, marketing, and recruitment operations through entities and/or business names including "iMarket Global Inc." and "IMG Corporations, Inc." (collectively "IMG"). However, despite being presented to Plaintiff as a distinct and operative business entity, IMG lacks a readily identifiable or consistent corporate presence in the jurisdictions where Plaintiff worked, including Pennsylvania.

48.    Publicly available information concerning IMG is inconsistent, incomplete, or difficult to verify, including disconnected or non-functional contact information and the use of shared or virtual office locations. These circumstances give rise to a reasonable inference that IMG functions, in whole or in part, as a nominal, intermediary, or front-facing entity through which SFE Energy conducts recruitment and sales activities while obscuring the identity of the entity or entities exercising actual operational control.

49.    For example, the location where IMG was located in Allentown and where Plaintiff reported for work, 535 Hamilton Street, Allentown, Pennsylvania, is referred to as an SFE Energy location online:



50.    The structure described to Plaintiff and experienced in practice reflects a system in which individuals are recruited, encouraged to recruit others, and financially incentivized based on both direct sales and the expansion of downstream sales networks.

51.    Upon information and belief, Defendants utilize a layered structure of entities, trade names, or informal organizations—including IMG—to create separation between the entities responsible for generating sales and those that ultimately receive the financial benefit of the energy contracts.

52.    This structure has the effect of obscuring the identity of the true operating entities, limiting transparency to consumers and workers, and complicating the ability of injured parties to identify responsible parties.

53.    Upon information and belief, the use of the name "IMG Corporations" is not fixed or consistently tied to a single identifiable legal entity, but instead may be used interchangeably or replaced over time.

54.    Upon information and belief, Plaintiff believes and therefore avers that such use of shifting or unregistered business names creates the appearance that when a particular name

becomes associated with complaints, regulatory scrutiny, or reputational harm, operations for SFE Energy and Family Energy may continue under different names so as to continue with sales schemes that garner it the reputation under its previous pseudonyms without dealing with the following reputational fallout that would normally accompany such a business model.

55.    Upon information and belief, SFE Energy derives substantial financial benefit from the sales activities conducted through individuals recruited under the IMG name and similar sales channels.

56.    Despite this benefit, Defendants have structured their operations so as to characterize the individuals performing the sales work as independent contractors associated with a separate entity, thereby attempting to distance themselves from liability arising out of those activities.

57.    The compensation and recruitment structure described above places significant emphasis on the continual recruitment of additional participants into the sales network, who are then expected to generate further sales and recruit additional individuals.

58.    Upon information and belief, this structure prioritizes expansion of the sales network and downstream recruitment in a manner that is not solely dependent on bona fide retail demand for energy services, but instead relies in substantial part on the continued influx of new participants.

59.    Plaintiff avers that Defendants' business model, as implemented through IMG and related channels, operates in a manner that emphasizes recruitment-driven growth and the leveraging of personal networks to generate sales.

60.     As a result of the foregoing, Plaintiff was subjected to a system in which the true identity of the responsible business entities was obscured, the nature of the business structure was not fully disclosed, and the risks and realities of the compensation model were misrepresented.

61.     At no time during Plaintiff's engagement was she provided with a Form W-2 nor a 1099, nor was she treated as an employee for payroll tax purposes performing work that was directed, controlled, and supervised by individuals associated with Defendants.

62.     Despite being told she was affiliated with IMG Corporations, Plaintiff, in practice, reported to and took direction from individuals who identified themselves as employees, agents, or representatives of SFE Energy.

63.     These individuals exercised control over Plaintiff's day-to-day activities.

64.     Upon further investigation, the contact information for IMG Corporations online, including telephone numbers, are either non-functional, disconnected, or redirected to unrelated businesses, further evidencing the lack of a legitimate and identifiable corporate presence.



15

65.     The absence of any verifiable corporate structure, coupled with the use of non-working or misleading contact information, created substantial confusion as to the true identity of Plaintiff's employer and the entity responsible for her compensation and working conditions.

66.     Upon information and belief, it is believed and therefore averred that Defendants utilized the name "IMG Corporations" as a façade or intermediary label through which individuals were recruited and deployed, while the actual business operations and financial benefits were derived by SFE Energy and/or related entities.

67.     This structure allowed Defendants to exert control over sales personnel while simultaneously attempting to avoid the legal obligations attendant to an employer-employee relationship, including tax withholding, wage protections, and regulatory compliance.

68.     Plaintiff avers that Defendants' use of an unregistered or non-existent entity name, combined with the misclassification of workers and the lack of transparency regarding corporate identity, constituted deceptive and unfair business practices.

**b. Sexual Harassment and Discrimination of Plaintiff by SFE Energy.**

69.     Ms. McMullan was hired on November 13, 2023 by an entity using the name "IMG" to serve as a recruiter and administrative staff person for IMG, but in actuality was working for SFE Energy (hereinafter "SFE") and reported to, worked closely with and was managed by employees of SFE Energy.

70.     Plaintiff was based in the Allentown, Pennsylvania office and was charged with recruiting individuals to work directly for SFE and IMG.

71.     Upon commencement of this legal action, Defendants abandoned the Allentown location and no longer has anyone located there; it is believed and therefore averred that Defendants did this to avoid this lawsuit.

16

72.    All communications between employees of IMG and SFE were done through the GroupMe app which Ms. McMullan was instructed to install on her phone.

73.    Furthermore, when Plaintiff was contacting potential sales candidates, she was instructed to use a VPN to access Indeed—an online recruiting platform. It is believed and therefore averred that the VPN was to conceal the true identity of the Defendants when recruiting sales candidates.

74.    Plaintiff reported to an SFE Energy employee by the name of Jeremy Bland who was responsible for setting up the Allentown IMG office.

75.    Shortly after Defendant Bland arrived in January 2024 from the Defendants' California Office, he began engaging in unwelcome sexual conduct, including comments about Plaintiff's appearance and requests for photographs.

76.    Bland exploited his authority to coerce Plaintiff into personal services unrelated to her employment, including caring for his dog at her own expense.

77.    The behavior began with comments about Ms. McMullan's appearance and asking Ms. McMullan to send him pictures of herself in workout attire.

78.    This put Ms. McMullan in an uncomfortable position because Mr. Bland was in a management position in the company.

79.    Mr. Bland continued to express interest in Ms. McMullan and then asked her to watch and care for his dog, Ella, during and outside of working hours.

80.    Ms. McMullan, as a single mother trying to provide for her child, perceived her job to be in jeopardy if she refused the requests of a higher up.

81.    As a result, Ms. McMullan spent her own money on supplies for the dog including, but not limited to, food, shampoo, brushes, litter bags and treats, and assisted with watching the dog.

82.    Ms. McMullan was the only employee in the Allentown office who was ever charged with watching Mr. Bland's dog.

83.    On January 24, 2024, Ms. McMullan was recognized by the IMG organization as being one of the Top Ten Recruiters in the entire organization.

84.    She was formally recognized by the VP of IMG, Carissa Catalfamo on the company communication site, GroupMe.

85.    This recognition only seemed to intensify the inappropriate sexual behavior by Mr. Bland. Such behavior included an incident in which Mr. Bland came into Ms. McMullan's office, closed the door, began to praise her as being the best recruiter in the company, and then while hugging and kissing her inappropriately groped her buttocks.

86.    After this incident, Mr. Bland became increasingly more predatory towards Ms. McMullan and began asking for more pictures of Ms. McMullan in her workout attire and then followed up these requests with sexually explicit emails.

87.    Bland continued sending sexually explicit messages and making coercive demands tied to his authority.

88.    The sexual attention reached its peak on or about February 4, 2024. On this day, Ms. McMullan was taking care of Mr. Bland's dog. Mr. Bland arrived, unannounced, at Ms. McMullan's apartment to pick up his dog at 7p.m.

89.    Uninvited, Mr. Bland proceeded to kick off his shoes and make himself comfortable on Ms. McMullan's couch and stayed for an hour.  He left Ms. McMullan's apartment at

approximately 8pm instructing Ms. McMullan to bring him fruit in the morning. The following day after a 3pm conference call, Mr. Bland told Ms. McMullan that her outfits distracted him and told her not to wear these clothes anymore because he would not be able to control himself seeing her in these clothes.

90.    He also told her to bring him salmon the next day. At this point, Mr. Bland began to make sexually suggestive remarks to Ms. McMullan and told Ms. McMullan that she could arrive at the office early, before anyone else, and he would turn off the cameras.

91.    In response, Ms. McMullan told Mr. Bland that she was not comfortable with that, to which Mr. Bland replied, "Girl, I call the shots, 1st, 2nd, and 3rd and don't you ever forget it."

92.    At this point, Mr. Bland was becoming more and more aggressive, and Ms. McMullan became very concerned realizing that was she being sexually harassed, and the harassing behavior was making the work environment hostile.

93.    On or about February 6, 2024, Bland entered Plaintiff's home late at night, remained uninvited, and later engaged in non-consensual sexual intercourse with Plaintiff while she was impaired and asleep, constituting sexual assault.

94.    On or about February 6, 2024, Plaintiff was in possession of Defendant Jeremy Bland's dog, Ella, at her residence while Bland was working in Hamburg, Pennsylvania.

95.    At approximately 8:29 p.m., Bland sent Plaintiff a text message stating, in substance, "don't get mad. I don't think I'll be over to pick up Ella because of issues going on with the female sales reps." This communication referenced ongoing workplace issues involving Bland and female employees and indicated uncertainty as to whether he would retrieve his dog that evening.

96.     Mr. Bland, uninvited, arrived at Ms. McMullan's apartment at approximately 10:50 p.m. Plaintiff reasonably believed that Bland was present solely to retrieve his dog and would promptly leave, particularly in light of the late hour and the parties' expectation of reporting to the office early the following morning.

97.     After entering the residence, Bland and Plaintiff briefly discussed workplace matters, including reports and rumors involving Bland's alleged relationships with multiple female sales representatives. This conversation occurred in Plaintiff's kitchen and related to ongoing issues within the work environment.

98.     After talking with Mr. Bland, Plaintiff subsequently advised Bland that she intended to step onto her balcony to use her legally prescribed medical marijuana and informed him that he could leave and that she would see him at work the following day. As part of her regular nighttime routine, she takes legally prescribed medical marijuana to assist with sleep, for which she maintains a valid medical marijuana card. While Plaintiff was on the balcony, she reasonably believed that Bland had exited the apartment. However, upon briefly exiting the room to remove herself from the awkward and uncomfortable situation, she returned to find Mr. Bland seated on her bed with his dog.

99.     Plaintiff immediately and unequivocally informed Mr. Bland that he was not permitted to stay, that she wanted him to leave and she did not permit overnight guests, further explaining that she wished to avoid escalating the situation in light of her daughter's presence in the adjacent room. Despite these clear directives, Mr. Bland refused to leave.

100.    Under these circumstances, Plaintiff—who reported directly to Mr. Bland—reasonably felt intimidated and uncertain to proceed, as her supervisor was disregarding her instructions and asserting control within her own home. She experienced a loss of autonomy and

control in her residence as a result of his conduct. Ultimately, Plaintiff retired to bed in the hope that Mr. Bland would depart on his own.

101.    Sometime in the middle of the night, while still half asleep, Ms. McMullan realized Mr. Bland  was kissing her face and neck while she had been asleep.

102.    At this point, Ms. McMullan realized that Mr. Bland was also "poking' her with his penis. Ms. McMullan was still under the effects of the medical marijuana she had taken before going to bed, and therefore was confused and uncertain about what was happening but did not express consent to these actions.

103.    Mr. Bland then proceeded to climb on top of her and engage in sexual intercourse.

104.    Plaintiff awoke while Bland was inside her and, upon realizing what was occurring, became distressed and verbally objected, demanding that he stop and get off of her. Bland then withdrew and ejaculated onto Plaintiff's body. He did not use any form of protection, and Plaintiff was not using birth control at the time.

105.    Immediately thereafter, Plaintiff got out of bed, went to the bathroom to clean herself, and again told Bland that he needed to leave her apartment and was not permitted to remain. Bland ignored Plaintiff's directive and returned to sleep in her bed. Plaintiff did not return to sleep and remained awake for the remainder of the night.

106.    He cleaned himself and went back to sleep, never speaking to Ms. McMullan.  Ms. McMullan could not go back to sleep and proceeded to take the dog for a walk.  When she left in the morning, Mr. Bland was still asleep in her bed, refusing to leave, with his dog still present in the apartment..

107.    Following this incident, in shock and suffering from anxiety due to this pattern of events, Ms. McMullan never spoke about what happened.

21

108.    On February 21, 2024, Ms. McMullan arrived at work at 7:30 a.m. and Mr. Bland arrived at the same time walking behind her. Mr. Bland asked Ms. McMullan to join him in the conference room.

109.    When Ms. McMullan went into the conference room, Mr. Bland followed her in, turned off the cameras and locked the conference room door. Mr. Bland then pushed Ms. McMullan up against the wall, pinning her arms over her head and started to kiss her face and neck.

110.    Ms. McMullan pushed him away, telling him to stop and left the office.  Shortly after, Ms. McMullan received a text message from one of the other SFE employees, "JP Denise", advising that she would be at the office soon.

111.    Ms. McMullan waited until she saw JP Denise walk into the office before going back.  She did not want to be alone with Mr. Bland in the office because at this point, she had no idea what he was capable of and did not want to be alone with him in the office.

112.    Later in the day, Ms. McMullan was approached by one of the corporate trainees who expressed discomfort and highlighted concerns about the workplace culture after an incident involving the California SFE employees and Mr. Bland being romantically involved with one of the corporate trainees which had led to an uncomfortable confrontation.

113.    It is believed that IMG and SFE were on notice of Mr. Bland's behavior of targeting female employees for sexual harassment and had chosen to ignore it.

114.    On February 24, 2024, Ms. McMullan advised Carissa Catalfamo VP for IMG that these issues pertaining to Mr. Bland in the office was making her physically sick and she had started to suffer from anxiety attacks.

22

115.    Ms. Catalfamo denied any knowledge of the incident but said she would talk to Mr. Bland and get to the bottom of it. Ms. Catalfamo further stated to Ms. McMullan that this wasn't the first time Mr. Bland has been sexually inappropriate with a girl from work, that he has a track record of messing with the women in his department and that when you deal with someone like Mr. Bland, he always wins.

116.    Mr. Bland continued to send Ms. McMullan sexually explicit messages throughout the month, despite Ms. McMullan repeatedly telling him she only wanted a professional relationship.

117.    On April 19, 2024, a conference call was held between Ms. McMullan, Mr. Bland and Carissa Catalfamo, the VP of IMG to discuss how to improve communications.

118.    During the call, Carissa expressed that she was disappointed that Jeremy, Ms. McMullan and Carlos Linares, the COO of IMG never sat down to discuss the issues in the office.

119.    After the conference call, Mr. Bland attempted to talk to Ms. McMullan about personal matters.    When Ms. McMullan refused, Mr. Bland abruptly became irate and began yelling at Ms. McMullan and during this tirade, Mr. Bland communicated to Ms. McMullan that he was terminating her contract and told her to leave immediately.

120.    When Ms. McMullan attempted to call Carissa Catalfamo, VP of IMG, to raise her concerns about the incident involving her termination by Mr. Bland and his inappropriate conduct, Mr. Bland took the phone out of her hand and hung up.

121.    Ms. McMullan was told by Mr. Bland to clean out her desk and leave the premises. At this point, Ms. McMullan, having viewed herself as having been constructively discharged due to Mr. Bland's action and the hostile work environment, responded by saying that she quit, and she left.

122. Following this incident, Ms. McMullan attempted to reach out to corporate management for IMG, but she was ignored, and her corporate email was deactivated and her GroupMe messages were erased.

123. From the beginning of her employment to her termination, Ms. McMullan was subjected to sexual harassment which was abusive and created a hostile work environment.

124. She was sexually assaulted twice by Mr. Bland and when she refused to engage in his sexually inappropriate conduct, Mr. Bland retaliated by terminating her contract.

125. Ms. McMullan endured this offensive conduct from Mr. Bland, a person in management or a supervisor, and it clearly became a condition of her continued employment.

126. Furthermore, the conduct was so severe or pervasive that it created a work environment that was intimidating, hostile, and abusive. These acts were in violation of Title VII of the Civil Rights Act of 1964 and The Pennsylvania Human Relations Act (PHRA) as well as in violation of many of the common law tort claims in Pennsylvania.

127. At all times material hereto, Defendants it is believed and therefore averred that Defendants employed more than 15 employees.

128. At all times material hereto, Defendants acted by and through their authorized agents, servants, workers, contractors, subcontractors and/or employees acting within the course and scope of their employment with Defendant and in furtherance of Defendant's business.

129. At all times material hereto, Defendant(s) acted as employer(s) within the meaning of the statutes which form the basis of this matter.

130. At all times material hereto, Plaintiff was an employee of Defendant(s) within the meaning of the statutes which form the basis of this matter.

131. Defendant's actions were in violation of Title VII of the Civil Rights Act of 1964, which prohibits employment discrimination based on race, color, religion, sex and national origin.

132. Defendant's termination and constructive termination of Plaintiff's employment is in clear violation of Title VII.

133. Defendant's creation of and failure to correct an intimidating, hostile, and offensive working environment is in clear violation of Title VII.

134. Defendant's discriminating acts against Plaintiff also violated the PHRA, which prohibits discrimination based on sex, including sexual harassment.

135. Plaintiff believes and therefore avers that Defendant's management, employees, agents, and/or non-employees knowingly created, allowed the creation of, and failed to correct an intimidating, hostile, and offensive working environment, which included sexual harassment against Plaintiff, and which culminated in Plaintiff's wrongful termination.

136. At all times relevant hereto, Defendant Jeremy Bland was an employee, agent, servant, and/or managerial representative of Defendants, and was acting within the course and scope of his employment and/or with apparent authority on behalf of Defendants.

137. At all relevant times, Defendant Bland was vested with supervisory authority over Plaintiff, including, but not limited to, the authority to direct her work, influence the terms and conditions of her employment, and affect or terminate her employment.

138. Defendant Bland used the authority granted to him by Defendants to engage in wrongful and unlawful conduct toward Plaintiff, including but not limited to harassment, coercion, intimidation, and sexual assault, as more fully described herein.

139. The aforesaid conduct of Defendant Bland occurred within the course and scope of his employment, was undertaken, in whole or in part, in furtherance of Defendants' business

25

interests, including the exercise of control over subordinate employees, and was accomplished through the use and abuse of the authority delegated to him by Defendants.

140. At all relevant times, Defendant Bland's conduct was reasonably foreseeable to Defendants and was enabled by the authority, power, and position conferred upon him.

141. Defendants had actual and/or constructive knowledge of Defendant Bland's misconduct but failed to take prompt and appropriate corrective action, thereby ratifying and condoning his conduct.

142. As a direct and proximate result of the aforesaid acts and omissions of Defendant Bland, for which Defendants are vicariously liable, Plaintiff sustained the injuries and damages described herein.

143. Defendant's discriminatory acts and omissions had a significant adverse disparate impact on Plaintiff.

144. Defendant willfully violated Title VII of the Civil Rights Act of 1964.

145. Defendant willfully violated the PHRA.

146. As a proximate result of Defendant's discrimination and unlawful employment practices, Plaintiff was deprived of the opportunity to earn wages, deprived of the opportunity to earn employment benefits, and deprived of the right to a work environment free from discrimination and harassment.

147. Plaintiff suffered severe emotional distress as a direct and proximate result of Defendants' unlawful conduct. The repeated acts of harassment, unwanted physical restraint, and attempted sexual contact created an environment of fear, humiliation, and psychological harm. Being physically confined against her will and subjected to continued advances caused Plaintiff to experience intense anxiety, panic, and a loss of personal safety in the workplace.

148.    The emotional toll of reporting the misconduct, only to have it acknowledged but not remedied by corporate leadership, significantly exacerbated Plaintiff's distress. Learning that Defendant Bland's prior misconduct was known yet ignored contributed to Plaintiff's feelings of helplessness, betrayal, and isolation. The failure to take corrective action reinforced a hostile work environment and intensified Plaintiff's psychological suffering.

149.    Despite Plaintiff's repeated efforts to maintain professional boundaries, the ongoing harassment caused her to endure chronic stress and emotional exhaustion. The persistence of the misconduct left Plaintiff in a constant state of apprehension, undermining her ability to perform her job duties and further damaging her mental well-being.

150.    The events surrounding Plaintiff's termination on April 19, 2024, were particularly traumatic. Being abruptly terminated after rejecting further personal engagement, having her personal property seized, and being forced to leave the workplace compounded Plaintiff's emotional injuries. This experience was degrading, intimidating, and contributed to lasting psychological harm.

151.    As a result of these events, Plaintiff has suffered and continues to suffer from trauma-related symptoms, including but not limited to anxiety, depression, sleep disturbances, and symptoms consistent with post-traumatic stress disorder (PTSD). Plaintiff experiences recurring intrusive thoughts, emotional distress when reminded of the events, and difficulty trusting workplace authority figures.

152.    Plaintiff has sought and continues to seek mental health treatment as a result of the unlawful conduct and circumstances surrounding Plaintiff's termination. Immediately following the incident, Plaintiff engaged in consistent therapeutic treatment for approximately one year and

has continued such treatment on an as-needed basis thereafter. Plaintiff's treating therapist is available and willing to provide documentation and/or complete any necessary forms upon request.

153.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer significant physical and psychological injuries. These manifestations include, but are not limited to, social withdrawal and isolation, insomnia and disrupted sleep patterns, and difficulty completing routine daily tasks.

154.    Plaintiff has also experienced physical symptoms associated with severe stress and anxiety, including recurrent episodes of vomiting, persistent nausea, body tremors, nightmares, cold sweats, and unintended weight loss.

155.    In addition, Plaintiff has suffered from panic attacks, heightened and persistent anxiety, a continuous sense of being on edge, periods of profound sadness, and intrusive thoughts and flashbacks related to the incident.

156.    Plaintiff's symptoms occur on a recurring basis throughout the day and have significantly increased Plaintiff's anxiety and contributed to avoidance behaviors.

157.    As a result of the foregoing, Plaintiff has altered daily routines, limited participation in ordinary activities, and continues to experience substantial interference with normal life functions.

158.    Defendants' subsequent actions, including erasing communications and cutting off Plaintiff's access to company systems, further aggravated Plaintiff's emotional distress. These acts not only impeded her ability to vindicate her rights but also deepened her anxiety, and ongoing psychological harm.

c.  **Unauthorized Utility Enrollment ("Slamming")**

159.    Following her termination from Defendants' employment, Plaintiff undertook a review of her personal and financial accounts. In doing so, Plaintiff discovered, for the first time, that she had been enrolled in a third-party energy supply contract associated with Defendants' business operations.

160.    Plaintiff never requested, authorized, or consented to any such enrollment. Upon information and belief, Defendants, or individuals acting on their behalf, improperly used Plaintiff's personal information—previously provided in the course of her employment—for the purpose of enrolling her in an energy supply contract without her knowledge or consent. This conduct constitutes "slamming," a deceptive practice whereby a consumer's energy supplier is switched without authorization.

161.    As a direct and proximate result of this unauthorized enrollment, Plaintiff became subject to contractual obligations she never agreed to, including an early termination fee. Upon discovering the unauthorized account and attempting to cancel the service, Plaintiff was required to pay an approximate $700 cancellation or "breakup" fee. Plaintiff suffered financial harm and emotional distress as a result of being fraudulently enrolled in this contract.

162.    Defendants' actions were intentional, deceptive, and undertaken in willful disregard of Plaintiff's rights, and are consistent with a broader pattern of misconduct alleged herein involving misleading and unauthorized energy enrollments.

163.    Upon information and belief, Defendants, including SFE, also known as IMG, engage in a pattern and practice of door-to-door solicitations targeting low-income communities and bilingual residents. Sales representatives request access to residents' utility bills under false

pretenses and, upon obtaining such information, use it to switch the residents' energy supply to an SFE-affiliated plan without the residents' knowledge or consent.

164.    As a result of this practice, affected individuals continue to receive utility bills that appear to originate from their existing utility company, but are in fact subject to separate and unauthorized energy supply contracts through SFE. Consequently, many residents remain unaware that their energy services have been switched.

165.    Upon information and belief, Defendants maintain a purported "customer service" telephone number that is unresponsive, thereby preventing affected consumers from obtaining information regarding their accounts or reversing the unauthorized changes without contacting their underlying utility provider directly.

166.    Upon information and belief, Defendants specifically target low-income and bilingual populations based on the belief that such individuals are less likely to detect or understand the unauthorized changes to their utility billing, including due to language barriers or limited literacy.

167.    This practice, commonly referred to as "slamming," has been the subject of prior enforcement actions. Family Energy Inc., another name under which SFE operates in New York, has been accused of and found liable for similar deceptive practices. N.Y. Att'y Gen., *Attorney General James Secures Over $2 Million for Consumers Deceived by Energy Service Companies* (Jan. 5, 2022), https://ag.ny.gov/press-release/2022/attorney-general-james-secures-over-2-million-consumers-deceived-energy-service

168.    On or about February 19, 2024, Carissa Catalfamo, acting on behalf of Defendants, requested Plaintiff's utility bill under the pretense that it was needed for promotional purposes. Carissa Catalfamo expressly represented that Plaintiff's private information would not be used for

any other purpose. Upon information and belief, Plaintiff's information was thereafter used, without her knowledge or consent, to enroll her in the unauthorized energy supply contract described herein.

169.    Plaintiff is informed and believes, and thereon alleges, that the foregoing practices are not isolated to Plaintiff, but are part of a widespread and systematic scheme affecting numerous similarly situated individuals.

170.    Plaintiff expressly reserves the right to seek leave of Court to amend this Complaint to assert class action allegations pursuant to Rule 23 of the Federal Rules of Civil Procedure, including but not limited to claims on behalf of a class of individuals who were similarly subjected to unauthorized energy enrollments and deceptive practices by Defendants.

171.    Plaintiff further reserves the right to pursue certification of such a class, to define appropriate class and/or subclass definitions, and to seek all relief available under applicable law on a class-wide basis.

**COUNT I**
**TITLE VII OF THE CIVIL RIGHTS**
**ACT ("TITLE VII")**

BRIDGET MCMULLAN
v.
ALL CORPORATE DEFENDANTS[23]

172.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs and incorporates the same by reference as though set forth fully herein.

---

[2] For the sake of brevity "all Corporate Defendants" refers to all named defendants in this Complaint with the exception of Jeremy Bland, John Doe #1, John Doe #2 and John Doe #3.

[3] The precise nature of the employment relationships among Defendants, including whether any Defendant qualifies as Plaintiff's "employer" under applicable law, is uniquely within Defendants' possession and control and remains subject to discovery. To the extent any Defendant is determined not to be Plaintiff's employer within the meaning of Title VII, the PHRA and any other applicable employment laws, such claims are asserted only to the extent they are not barred by the applicable employment laws and Plaintiff pleads these foregoing and subsequent claims concurrently and in alternative pursuant to Fed. R. Civ. P. 8(d).

173.   At all relevant times, the Defendants have been, and continue to be, an employer within the meaning of Title VII.

174.   At all relevant times, the Defendants have employed, and continues to employ, 15 or more employees.

175.   Defendants, including their agents, supervisors, managers, representatives, servants, employees, successors in interest, co-conspirators, and/or alter egos, engaged in a pattern and practice of unlawful sexual harassment by subjecting Plaintiff to sexual discrimination, disparate treatment and retaliation in violation of Title VII.

176.   The above-described sex discrimination and retaliations created an intimidating, oppressive, hostile, and offensive work environment that interfered with Plaintiff's emotional well-being and her ability to perform her work.

177.   Defendants, at all times relevant hereto, had actual and constructive knowledge of the conduct described above.

178.   Defendants failed to take all reasonable steps to prevent sexual harassment from occurring, and to protect Plaintiff from sexual harassment and retaliation.

179.   Defendants violated Title VII by failing to adequately supervise, control, or discipline, and/or otherwise penalize the conduct, acts, and failures to act as described above.

180.   As a result of the hostile and offensive work environment maintained by Defendants' failure to protect Plaintiff from further harassment and retaliation, Plaintiff was constructively terminated and was forced to resign her employment.

181.   Plaintiff is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendants have engaged in discriminatory practices against her

which are not yet fully known. At such time as said discriminatory practices become known to her, Plaintiff will seek leave of the Court to amend this Complaint in that regard.

182.    Plaintiff has filed charges of discrimination with the EEOC, a true and correct copy of which is attached hereto as Exhibit #1, and incorporated herein by reference. The EEOC issued a Right to Sue Notice authorizing this lawsuit, a true and correct copy of which is attached hereto as Exhibit #2 and incorporated herein by reference. Plaintiff has exhausted her administrative remedies.

183.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer, including, but not limited to, emotional distress, consisting of outrage, shock, isolation, feelings of lack of self-worth and humiliation, reasonably occurring and likely to occur based on the sexual discrimination and retaliation she experienced and the Defendant's failure to take prompt and appropriate remedial action; and she has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.

184.    Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

185.    The outrageous conduct of Defendant described above was malicious and oppressive, and done with a conscious disregard of Plaintiff's rights, and with the intent to injure Plaintiff.

186.    Defendant, by and through its agents and employees acted in their capacities as the managing agents of Defendant, Defendant ratified the conduct by doing nothing despite its knowledge of the unlawful conduct, and Defendant's conduct was intentional, willful and with reckless indifference to the rights of the Plaintiff; therefore, Plaintiff is entitled to punitive damages from Defendant.

33

187.    As a further direct and proximate result of Defendant's violation of Title VII, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship with Defendant as has thereby incurred, and will continue to incur, legal fees and costs, and therefore Plaintiff requests that attorneys' fees be awarded pursuant to 42 U.S.C. § 1988 (b) also known as the Civil Rights Attorney's Fees Award Act of 1976

188.    No previous application has been made for the relief requested herein.

189.    Defendants engaged in intentional, willful, wanton and wrongful conduct, and acted with reckless indifference to the rights of others which has caused Plaintiff to suffer continued mental anguish and emotional distress.

## COUNT II
## PENNSYLVANIA HUMAN
## RELATIONS ACT ("PHRA")

BRIDGET MCMULLAN
v.
ALL CORPORATE DEFENDANTS

190.    Plaintiff incorporates by reference the foregoing paragraphs, as if set forth herein in their entirety.

191.    Defendants, by the above improper, unlawful, and discriminatory acts and omissions, has violated the PHRA.

192.    Said violations were intentional, willful and with reckless indifference to the rights of the Plaintiff.

193.    As a direct and proximate result of Defendants' violation of the PHRA, Plaintiff has sustained injuries, damages, and losses set forth herein and has incurred attorney's fees and costs.

34

194.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory acts unless and until this Court grants the relief requested herein.

195.    Defendants engaged in intentional, willful, wanton and wrongful conduct, and acted with reckless indifference to the rights of others which has caused Plaintiff to suffer continued mental anguish and emotional distress.

## COUNT III
## NEGLIGENT INFLICTION OF
## EMOTIONAL DISTRESS

BRIDGET MCMULLAN
v.
ALL DEFENDANTS

196.    Plaintiff incorporates by reference all foregoing paragraphs, as if set forth herein in their entirety.

197.    Defendants negligently engaged in certain acts as alleged herein and above, which proximately resulted in injury and emotional distress to Plaintiff.

198.    At all relevant times hereto, Defendants owed Plaintiff a duty to act with reasonable care and/or the emotional distress to Plaintiff was reasonably foreseeable.

199.    At all times material hereto, Defendants knew, or in the exercise of ordinary care should have known, that unless Defendants ceased to engage in the aforementioned acts that the conduct would subject Plaintiff to emotional distress.

200.    At all times relevant hereto, Defendants had the power, ability, authority, and duty to stop engaging in the conduct described herein.

201.    At all relevant times hereto, Defendants knew, or reasonably should have known, that the conduct described herein would and did proximately result in Plaintiff's physical and emotional distress.

202.    At all relevant times, Defendant was the employer of Defendant Jeremy Bland and exercised control over Defendant Jeremy Bland's work duties and conditions of employment.

203.    Defendant Jeremy Bland engaged in unlawful sexual harassment against Plaintiff while acting within the course and scope of his employment with Defendant.

204.    Defendant is vicariously liable for the wrongful conduct of Defendant Jeremy Bland under the doctrine of respondeat superior, as the harassment occurred within the scope of Defendant Jeremy Bland's employment and was facilitated by the authority granted to them by Defendant.

205.    Defendant Jeremy Bland knew or should have known of Defendant Jeremy Bland's conduct and failed to take appropriate corrective action to prevent or remedy the harassment.

206.    As a direct and legal result of Defendants' wrongful acts, Plaintiff has suffered injury to mind and body and will continue to suffer significant physical distress, pain and suffering and mental anguish and emotional distress.

207.    Defendants engaged in intentional, willful, wanton and wrongful conduct, and acted with reckless indifference to the rights of others which has caused Plaintiff to suffer continued mental anguish and emotional distress.

### COUNT IV
### INTENTIONAL INFLICTION OF
### EMOTIONAL DISTRESS

BRIDGET MCMULLAN
v.
ALL DEFENDANTS

36

208. Plaintiff incorporates by reference all foregoing paragraphs as if set forth herein in their entirety.

209. Defendant intentionally engaged in certain acts as alleged herein and above, which directly resulted in mental anguish and emotional distress to Plaintiff.

210. At all times relevant hereto, Defendant owed Plaintiff a duty to act with reasonable care and/or the emotional distress to Plaintiff was reasonably foreseeable.

211. At all times relevant hereto, Defendant knew, or should have known, that Defendant's intentional conduct and acts towards Plaintiff would subject Plaintiff to emotional distress.

212. At all times relevant hereto, Defendant had the power, authority, ability and duty to stop engaging in the intentional conduct described herein.

213. At all times relevant hereto Defendant knew or should have known that the intentional conduct towards Plaintiff would and did inflict severe physical and emotional distress.

214. At all relevant times, Defendant was the employer of Defendant Jeremy Bland and exercised control over Defendant Jeremy Bland's work duties and conditions of employment.

215. Defendant Jeremy Bland engaged in unlawful sexual harassment against Plaintiff while acting within the course and scope of his employment with Defendant.

216. As a direct and proximate result of Defendants' aforesaid intentional, willful, and outrageous conduct, Plaintiff suffered severe and objectively verifiable physical manifestations of emotional distress, including but not limited to persistent insomnia, frequent panic attacks, nausea, headaches, gastrointestinal distress, elevated heart rate, and significant weight fluctuation. Plaintiff further experienced ongoing fatigue, difficulty concentrating, and other stress-related physical impairments. These physical conditions were not transient or trivial, but rather were severe,

37

continuous, and of such a nature that a reasonable person would be unable to adequately cope with the mental distress inflicted, thereby constituting the type of severe emotional distress accompanied by physical harm recognized under Pennsylvania law.

217.    Defendant is vicariously liable for the wrongful conduct of Defendant Jeremy Bland under the doctrine of respondeat superior, as the harassment occurred within the scope of Defendant Jeremy Bland's employment and was facilitated by the authority granted to them by Defendant.

218.    Defendant knew or should have known of Defendant Jeremy Bland's conduct and failed to take appropriate corrective action to prevent or remedy the harassment.

219.    Defendants engaged in intentional, willful, wanton and wrongful conduct, and acted with reckless indifference to the rights of others which has caused Plaintiff to suffer continued mental anguish and emotional distress.

## <u>COUNT V</u>
## NEGLIGENCE

BRIDGET MCMULLAN
v.
ALL DEFENDANTS

220.    Defendant, at all relevant times, was an employer engaged in business within the Commonwealth of Pennsylvania, and at all times pertinent to this Complaint, employed Jeremy Bland.

221.    At all times relevant herein, Plaintiff was employed by Defendants, during which time Plaintiff was subjected to unwelcome and unlawful sexual harassment by Jeremy Bland.

222.    At all relevant times, Defendants had a duty to exercise reasonable care in hiring, training, and supervising its employees, including Jeremy Bland, to ensure that their actions would not harm others in the workplace.

38

223. Defendants should have known, through the exercise of reasonable care and diligence, that Employee was unfit for employment in a position of authority or interaction with other employees; despite this, Defendants negligently hired and failed to properly supervise Jeremy Bland, allowing him to engage in sexually harassing behavior towards Plaintiff.

224. Defendants' actions created an unlawful and hostile work environment for Plaintiff, causing emotional distress, psychological harm, and damage to Plaintiff's personal dignity and integrity.

225. As a direct and proximate result of Defendants' negligent hiring, supervision, and retention of Employee, Plaintiff has suffered substantial harm, including emotional distress, loss of reputation, humiliation, physical and psychological pain, and other damages.

226. Defendants engaged in willful or wanton conduct, or acted with reckless indifference to the rights of others.

## COUNT VI
## RETALIATION AND COERCION

BRIDGET MCMULLAN
v.
ALL DEFENDANTS

227. Plaintiff hereby incorporates by reference all preceding paragraphs as if set forth fully herein.

228. Here, the harassment and frivolous and arbitrary infractions began shortly after Ms. Barley commenced her protected activity.

229. Plaintiff engaged in protected activity when she met with VP of IMG to report ongoing sex-based discrimination, hostile treatment and harassment.

39

230.    Rather than address her concerns, Defendants immediately began a pattern of retaliation against Plaintiff for engaging in that protected activity. This retaliation included escalating hostility from her supervisor Jeremy Bland.

231.    These actions occurred in close temporal proximity to Plaintiff's discussion with leadership about harassment, sexual misconduct, and discriminatory treatment by Jeremy Bland.

232.    The retaliatory conduct culminated in conditions so intolerable that Plaintiff, mentally and emotionally exhausted, which then culminated in Jeremy Bland then berating and demeaning the Plaintiff and then terminating her.

233.    Defendant's conduct constitutes retaliation in violation of Title VII (42 U.S.C. § 2000e-3(a)) and the PHRA (43 P.S. § 955(d)), both of which prohibit employers from retaliating against employees who oppose discriminatory practices or participate in any manner in proceedings under those statutes.

234.    Defendant's conduct as alleged above constitutes coercion, intimidation, threats, and/or interference with Plaintiff's rights under Title VII and the PHRA.

235.    As a result, the Defendant's conduct was retaliation and coercion against the Plaintiff because Defendant engaged in activities protected by Title VII and the PHRA.

236.    Defendant has conducted itself intentionally, deliberately, willfully, and in callous disregard of the rights of Plaintiff.

237.    By reason of the Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available under Title VII and the PHRA.

## COUNT VII
### NEGLIGENT TRAINING, SUPERVISION, AND RETENTION

BRIDGET MCMULLAN
v.
ALL CORPORATE DEFENDANTS

40

238. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

239. At all relevant times, Defendants owed Plaintiff a duty to exercise reasonable care in the hiring, training, supervision, and retention of their employees, agents, servants, and/or contractors, including Defendant Jeremy Bland.

240. At all relevant times, Defendants owed Plaintiff a duty to exercise reasonable care in the hiring, training, supervision, and retention of their employees, agents, and/or servants, including Defendant Jeremy Bland.

241. This duty included, *inter alia*, the obligation to:

    a. conduct reasonable background checks;

    b. ensure that individuals placed in supervisory positions were fit for such roles;

    c. properly train employees regarding workplace conduct, harassment, and appropriate boundaries; and

    d. monitor, supervise, and discipline employees to prevent foreseeable harm to others.

242. This duty included the obligation to take reasonable steps to ensure that individuals placed in positions of authority did not pose a foreseeable risk of harm to subordinate employees, particularly with respect to sexual harassment, coercion, and abuse of power.

243. Defendants breached these duties by negligently hiring, supervising, and retaining Defendant Bland in a supervisory position over Plaintiff despite his known or knowable unfitness for such a role.

244. Upon information and belief, prior to and during Plaintiff's employment, Defendant Bland engaged in a pattern of inappropriate and/or sexually improper conduct toward female employees.

245. Defendants had actual notice of Defendant Bland's propensity for such misconduct, including but not limited to prior complaints, reports, or internal knowledge of his behavior, as evidenced in part by management's acknowledgment that Defendant Bland had a "track record" of inappropriate conduct with female subordinates.

246. Alternatively, and at a minimum, Defendants had constructive notice of Defendant Bland's unfitness, as such conduct would have been discovered through the exercise of reasonable care in supervision, monitoring, and enforcement of workplace policies.

247. Despite such knowledge, Defendants failed to take reasonable remedial measures, including but not limited to:

      a. conducting a proper investigation;

      b. imposing discipline or restrictions;

      c. removing Defendant Bland from a supervisory role; or

      d. implementing safeguards to protect employees under his authority.

248. Defendants further failed to implement, enforce, or meaningfully apply adequate anti-harassment policies, reporting mechanisms, or supervisory oversight, thereby permitting a culture in which such misconduct could occur unchecked.

249. Upon information and belief, Defendants knew or should have known, through the exercise of reasonable care, that Defendant Bland had a propensity to engage in inappropriate, harassing, and/or sexually predatory behavior toward female employees.

250.    Defendants' negligence permitted Defendant Bland to use his position of authority to engage in a pattern of unlawful conduct, including harassment, coercion, and sexual assault, as described herein.

251.    The harm suffered by Plaintiff was a foreseeable and natural consequence of Defendants' failure to exercise reasonable care in the hiring, supervision, and retention of Defendant Bland.

252.    As a direct and proximate result of Defendants' negligent hiring, supervision, and retention:

> a.  Plaintiff was subjected to severe and pervasive sexual harassment;
>
> b.  Plaintiff was sexually assaulted;
>
> c.  Plaintiff was subjected to a hostile and abusive work environment; and
>
> d.  Plaintiff suffered emotional distress, psychological injury, humiliation, loss of income, and other damages.

253.    Furthermore, as a direct result of Defendants' failures, Defendant Bland was enabled to misuse his authority to engage in escalating misconduct against Plaintiff, including coercion, harassment, intimidation, and sexual assault.

254.    Defendants' conduct, as described herein, demonstrates a reckless disregard for the safety and rights of Plaintiff and other employees.

255.    As a direct and proximate result of Defendants' negligence, Plaintiff has suffered damages as set forth above and is entitled to compensatory damages, as well as all other relief permitted under Pennsylvania law.

256.    The harm suffered by Plaintiff was a foreseeable and natural consequence of Defendants' negligent hiring, supervision, and retention of Defendant Bland.

257. Defendants' conduct went beyond mere negligence and constituted reckless indifference to the rights and safety of Plaintiff, in that Defendants consciously disregarded a known risk that Defendant Bland would engage in harmful misconduct.

258. Defendants' actions and omissions, undertaken with reckless indifference and conscious disregard of a known risk of harm, warrant the imposition of punitive damages under Pennsylvania law.

## COUNT VIII
## CORPORATE NEGLIGENCE / DIRECT LIABILITY

BRIDGET MCMULLAN
v.
ALL CORPORATE DEFENDANTS

259. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

260. Defendants, as an integrated enterprise and joint employers, owed Plaintiff non-delegable duties to provide a safe workplace and to protect employees from foreseeable harm, including sexual harassment and abuse by supervisory personnel.

261. Defendants breached these duties through systemic and organizational failures, including but not limited to:

    a. failing to establish and enforce effective anti-harassment policies;

    b. failing to implement adequate reporting and complaint mechanisms;

    c. failing to properly train supervisory personnel regarding appropriate workplace conduct;

    d. failing to monitor and oversee managerial employees;

    e. tolerating and/or ratifying a culture of misconduct; and

    f. prioritizing business operations over employee safety.

44

262. Upon information and belief, Defendants' corporate structure and use of overlapping entities contributed to a lack of accountability, oversight, and enforcement of workplace protections.

263. Defendants' management had actual knowledge of Defendant Bland's misconduct and propensity for inappropriate behavior, yet failed to take meaningful corrective action.

264. These systemic failures created an environment in which misconduct was foreseeable, permitted, and effectively encouraged.

265. As a direct and proximate result of Defendants' corporate negligence, Plaintiff was subjected to harassment, assault, and a hostile work environment, resulting in the damages described herein.

266. Defendants' conduct constituted reckless indifference to the rights and safety of Plaintiff, warranting punitive damages.

### COUNT IX
### VIOLATION OF PENNSYLVANIA UNFAIR TRADE
### PRACTICES AND CONSUMER PROTECTION LAW (UTPCPL)
73 P.S. § 201-1, et seq.
BRIDGET MCMULLAN
v.
ALL DEFENDANTS

267. Plaintiff incorporates by reference all preceding paragraphs. Defendants engaged in unfair methods of competition and deceptive acts or practices, including but not limited to enrolling Plaintiff in an energy supply contract without her knowledge or consent and misusing her personal information. Such conduct constitutes "slamming" and falls within the prohibited practices under the UTPCPL, including fraudulent and deceptive conduct creating a likelihood of confusion or misunderstanding.

268. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein. Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 et seq. Such unlawful conduct includes, but is not limited to, enrolling Plaintiff in an energy supply contract without her knowledge, authorization, or consent, and misappropriating and using Plaintiff's personal identifying information—provided solely for employment purposes—for an unrelated commercial transaction.

269. Defendants' actions constitute "slamming," a prohibited and deceptive practice in which a consumer's energy supplier is switched without informed consent. Defendants' conduct further includes fraudulent and deceptive representations and omissions, the creation of a likelihood of confusion and misunderstanding as to the source, sponsorship, approval, or authorization of the energy services, and the use of Plaintiff's identity to effectuate a transaction she did not authorize.

270. Defendants' conduct was part of a pattern and practice of deceptive business operations as described herein, including the use of misleading sales tactics, lack of transparency, and the intentional circumvention of consumer consent requirements. Such conduct is immoral, unethical, oppressive, and unscrupulous, and offends established public policy as embodied in the UTPCPL.

271. Plaintiff justifiably relied on the integrity of Defendants' business practices and had a reasonable expectation that her personal information would not be used for unauthorized purposes. Defendants' misuse of that information deprived Plaintiff of the ability to make an informed consumer decision and resulted in her being unknowingly bound to a contract.

272.     As a direct and proximate result of Defendants' violations of the UTPCPL, Plaintiff suffered ascertainable losses, including but not limited to the imposition of an approximately $700 early termination fee, as well as other financial harm and damages associated with the unauthorized contract.

273.     Defendants' conduct was willful, knowing, and undertaken with reckless indifference to the rights of Plaintiff and other consumers. Accordingly, Plaintiff is entitled to all relief available under the UTPCPL, including but not limited to treble damages, attorneys' fees, costs of suit, and such other relief as the Court deems just and proper.

274.     As a direct and proximate result of Defendants' violations, Plaintiff suffered ascertainable losses, including but not limited to the $700 termination fee and related damages. Defendants' conduct was willful and knowing, entitling Plaintiff to treble damages, attorneys' fees, and costs.

## COUNT X
## COMMON LAW FRAUD / FRAUDULENT MISREPRESENTATION
BRIDGET MCMULLAN
v.
ALL DEFENDANTS

275.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

276.     Defendants knowingly, intentionally, and without authorization used Plaintiff's personal identifying information—obtained in the course of her employment—to enroll her in an energy supply contract.

277.     In doing so, Defendants falsely represented, either expressly or implicitly, to Plaintiff that her information would not be used for enrollment to service without her authorization and Defendants further falsely represented, either expressly or implicitly, to third parties that Plaintiff had requested, authorized, and consented to such enrollment, when in fact she had not.

47

278. Defendants made these misrepresentations with the intent that they be relied upon by Plaintiff and third parties, including but not limited to the energy supplier and/or utility provider, to effectuate and validate the unauthorized transaction.

279. Plaintiff neither consented to nor had knowledge of the enrollment at the time it occurred and did not discover the existence of the contract until after her termination from Defendants' employment.

280. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff incurred damages, including but not limited to financial loss, the imposition of contractual obligations, and liability for an early termination fee.

281. Defendants' conduct was willful, intentional, and undertaken with malice and reckless indifference to Plaintiff's rights.

282. Such conduct constitutes fraud and was carried out in conscious disregard of the foreseeable harm to Plaintiff.

283. Furthermore, Defendants' conduct falls within the well-established framework of unfair and deceptive practices prohibited under federal law, including those articulated in Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), which—although not providing a private right of action—defines the contours of unlawful conduct in interstate commerce.

284. Defendants' actions were deceptive in that they were likely to mislead reasonable parties and involved material misrepresentations, and were unfair in that they caused substantial injury to Plaintiff that she could not reasonably avoid and which was not outweighed by any legitimate business justification.

285. Defendants' conduct was willful, knowing, and undertaken with reckless indifference to the rights of Plaintiff and other consumers.

286.    As a result, Plaintiff is entitled to recover compensatory damages, punitive damages, and such other relief as the Court deems just and appropriate.

## COUNT XI
## NEGLIGENT MISREPRESENTATION
BRIDGET MCMULLAN
v.
ALL DEFENDANTS

287.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

288.    At all relevant times, Defendants were engaged in business and had a duty to exercise reasonable care and competence in obtaining, handling, and using Plaintiff's personal identifying information, including information provided in the course of her employment.

289.    Defendants supplied false information, including but not limited to representations—express or implied—that Plaintiff had requested, authorized, and consented to enrollment in an energy supply contract.

290.    Defendants failed to exercise reasonable care or competence in communicating, verifying, and/or using such information, including by failing to confirm Plaintiff's authorization and by improperly using her personal information for an unauthorized commercial purpose.

291.    Defendants intended, or should have reasonably foreseen, that such false information would be relied upon by third parties, including but not limited to energy suppliers and/or utility providers, in processing and effectuating the enrollment.

292.    Defendants further intended, or should have reasonably foreseen, that Plaintiff would be affected by such misrepresentations, including being bound to contractual obligations without her knowledge or consent.

293.    Defendants further represented, either impliedly or expressly, that Plaintiff's personal information would not be dispersed to third parties for personal benefit, and to the detriment of the Plaintiff.

294.    Plaintiff justifiably relied on the integrity of Defendants' conduct and had a reasonable expectation that her personal information would be used only for legitimate and authorized purposes.

295.    As a direct and proximate result of Defendants' negligent misrepresentations and failures to exercise reasonable care, Plaintiff suffered damages, including but not limited to financial loss, contractual liability, and the imposition of an early termination fee.

296.    Defendants' conduct was willful, knowing, and undertaken with reckless indifference to the rights of Plaintiff and other consumers.

297.    As a result, Plaintiff is entitled to recover punitive and compensatory damages, together with such other relief as the Court deems just and appropriate.

## COUNT XII
### ASSAULT
BRIDGET MCMULLAN
v.
JEREMY BLAND

298.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

299.    Defendant Jeremy Bland intentionally engaged in conduct that placed Plaintiff in reasonable apprehension of an imminent harmful or offensive contact.

300.    Defendant Bland's actions included, but were not limited to, threatening behavior, coercive conduct, and unwelcome advances of a sexual nature.

301.    Plaintiff did not consent to Defendant Bland's conduct.

50

302. As a direct and proximate result of Defendant Bland's actions, Plaintiff suffered fear, emotional distress, and other damages as described herein.

303. Defendant Bland's conduct was willful, knowing, and undertaken with reckless indifference to the rights of Plaintiff and other consumers.

304. As a result, Plaintiff is entitled to recover punitive and compensatory damages, together with such other relief as the Court deems just and appropriate.

## COUNT XII
### BATTERY
BRIDGET MCMULLAN
v.
JEREMY BLAND

305. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

306. Defendant Jeremy Bland intentionally made harmful and/or offensive physical contact with Plaintiff without her consent.

307. The contact included, but was not limited to, unwanted touching of a sexual nature.

308. Defendant Bland's actions were intentional, unpermitted, and offensive to a reasonable sense of personal dignity.

309. As a direct and proximate result of Defendant Bland's conduct, Plaintiff suffered physical injury, emotional distress, and other damages as described herein.

310. Defendant Bland's conduct was willful, knowing, and undertaken with reckless indifference to the rights of Plaintiff and other consumers.

311. As a result, Plaintiff is entitled to recover punitive and compensatory damages, together with such other relief as the Court deems just and appropriate.

### IDENTITY THEFT / UNLAWFUL USE OF PERSONAL IDENTIFYING INFORMATION

51

**(42 Pa.C.S. § 8315; 18 Pa.C.S. § 4120)**

BRIDGET MCMULLAN
v.
ALL DEFENDANTS

312.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

313.    At all relevant times, Plaintiff possessed personal identifying information, including but not limited to her name, personal data, identifying records, and other confidential information.

314.    Defendants, by and through their agents, servants, and/or employees, including Defendant Jeremy Bland, intentionally and without authorization possessed, transferred, used, and/or attempted to use Plaintiff's personal identifying information.

315.    Defendants did so without Plaintiff's consent and through deceptive, fraudulent, and/or wrongful means.

316.    Defendants' conduct was undertaken for an unlawful purpose, including but not limited to obtaining a benefit, exercising improper control over Plaintiff, facilitating harassment, and/or furthering other wrongful acts described herein.

317.    The aforesaid conduct constitutes "identity theft" as defined by 18 Pa.C.S. § 4120, in that Defendants used Plaintiff's identifying information without her consent to further unlawful purposes.

318.    Pursuant to 42 Pa.C.S. § 8315, Plaintiff has a civil cause of action against Defendants for damages arising from such identity theft.

319.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered actual damages, including but not limited to financial loss, emotional distress, reputational harm, and other injuries as described herein.

320.    Defendants' conduct was intentional, willful, wanton, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to compensatory damages, punitive damages, attorneys' fees, and costs as permitted by law.

## RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

  a. For compensatory damages and general damages according to proof at trial;

  b. For attorneys' fees, litigation expenses and costs pursuant to statute and costs of suit;

  c. For prejudgment interest on all amounts claimed

  d. Punitive Damages; and

  e. Such other and further relief as the Court deems just and proper.

FURTHER, demands judgment against Defendant for punitive damages for its willful, wanton, and outrageous disregard for the rights of Plaintiff and reckless conduct towards Plaintiff's safety.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable in this action.

Respectfully submitted,

LEESON & LEESON

BY:    *//s// Joseph F. Leeson, III*
        JOSEPH F. LEESON, III, ESQUIRE
        Attorney for Plaintiff
        PA Bar Id. No. 328520
        70 East Broad Street
        Bethlehem, PA 18016
        (610) 691-3320
        jleeson@leeson-law.com

54

# EXHIBIT 1

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | ☐ FEPA<br>☒ EEOC | |

| Pennsylvania Human Relations Commission | and EEOC |
|---|---|
| *State or local Agency if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Ms. Bridget McMullan | | |

**Street Address**

2723 Bethlehem Fields Way
Bethlehem, PA 18015

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name:<br>IMG Corporations/Summit Family Energy | No. Employees, Members<br>25+ | Phone No. *(Include Area Code)*<br>484.245.4992 |
|---|---|---|

**Street Address**

535 Hamilton Street
Allentown, PA 18101

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 12/20/2023   Latest: 04/19/2024

☐ CONTINUING ACTION

**SEE ATTACHED**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Date: 10/2/24   *Charging Party Signature* Bridget McMullan | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

_____ and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s))*:

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| _____    _____<br>    Date           Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

CP Enclosure with EEOC Form 5 (5/01)

PRIVACY ACT STATEMENT: Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.    FORM NUMBER/TITLE/DATE. EEOC Form 5, Charge of Discrimination (5/01).

2.    AUTHORITY. 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117.

3.    PRINCIPAL PURPOSES. The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti- discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.    ROUTINE USES. This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.    WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION. Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII or the ADA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

Ms. McMullan was hired on November 13, 2023 by IMG Corporation to serve as a recruiter for Summit Family Energy (hereinafter "SFE"). Upon information and belief, SFE is a subsidiary of IMG Corporation. She was based in the Allentown, Pennsylvania office and was charged with recruiting individuals to work directly for SFE. All communications between employees of IMG and SFE were done through the GroupMe app which Ms. McMullan was instructed to install on her phone.

On January 4, 2024, the Master Partner for SFE, Jeremy Bland, arrived from California, along with other California SFE employees, to rebuild the Allentown office. Shortly after the arrival of Jeremy Bland at the Allentown office, Mr. Bland started to sexually harass Ms. McMullan. The behavior began with comments about Ms. McMullan's appearance and asking Ms. McMullan to send him pictures of herself in workout attire. This put Ms. McMullan in an uncomfortable position because Mr. Bland was in a management position in the company.

Mr. Bland continued to express interest in Ms. McMullan and then asked her to watch and care for his dog, Ella, during and outside of working hours. Ms. McMullan, as a single mother trying to provide for her child, perceived her job to be in jeopardy if she refused the requests of a higher up. As a result, Ms. McMullan spent her own money on supplies for the dog including, but not limited to, food, shampoo, brushes, litter bags and treats, and assisted with watching the dog. Ms. McMullan was the only employee in the Allentown office who was ever charged with watching Mr. Bland's dog.

On January 24, 2024, Ms. McMullan was recognized by the IMG organization as being one of the Top Ten Recruiters in the entire organization. She was formally recognized by the VP of IMG, Carissa Catalfamo on the company communication site, GroupMe. This recognition only seemed to intensify the inappropriate sexual behavior by Mr. Bland. Such behavior included an incident in which Mr. Bland came into Ms. McMullan's office, closed the door, began to praise her as being the best recruiter in the company, and then while hugging and kissing her placed his hands inappropriately on her buttocks. After this incident, Mr. Bland became increasingly more predatory towards Ms. McMullan and began asking for more pictures of Ms. McMullan in her workout attire and then followed up these requests with sexually explicit emails.

The sexual attention reached its peak on or about February 4, 2024. On this day, Ms. McMullan was taking care of Mr. Bland's dog. Mr. Bland arrived, unannounced, at Ms. McMullan's apartment to pick up his dog at 7p.m. Uninvited, Mr. Bland proceeded to kick off his shoes and make himself comfortable on Ms. McMullan's couch and stayed for an hour. He left Ms. McMullan's apartment at approximately 8pm instructing Ms. McMullan to bring him fruit in the morning. The following day after a 3pm conference call, Mr. Bland told Ms. McMullan that her outfits distracted him and told her not to wear these clothes anymore because he would not be able to control himself seeing her in these clothes. He also told her to bring him salmon the next day. At this point, Mr. Bland began to make sexually suggestive remarks to Ms. McMullan and told Ms. McMullan that she could arrive at the office early, before anyone else, and he would turn off the cameras. In response, Ms. McMullan told Mr. Bland that she was not comfortable with that, to which Mr. Bland replied, "Girl, I call the shots, 1st, 2nd, and 3rd and don't you ever forget it." At this point, Mr. Bland was becoming more and more aggressive, and Ms. McMullan became very

concerned realizing that was she being sexually harassed, and the harassing behavior was making the work environment hostile.

Shortly after these comments, on or about February 6, 2024, Mr. Bland, uninvited, arrived at Ms. McMullan's apartment at approximately 10:50 p.m. with his dog. Mr. Bland asked for something to eat, and Ms. McMullan cooked him salmon and pasta. After eating salmon, Mr. Bland stated that he was too tired to go home and asked to sleep at Ms. McMullan's place. Although uncomfortable with the circumstances, Ms. McMullan acquiesced. Each night, before going to bed, Ms. McMullan takes medical marijuana to assist her with sleeping (Ms. McMullan has a medical marijuana card). That night, Ms. McMullan took her prescribed medication of marijuana and proceeded to go to bed. Mr. Bland joined her in the same bed. Sometime in the middle of the night, while still half asleep, Ms. McMullan realized Mr. Bland was kissing her face and neck while she had been asleep. At this point, Ms. McMullan realized that Mr. Bland was also "poking' her with his penis. Ms. McMullan was still under the effects of the medical marijuana she had taken before going to bed, and therefore was confused and uncertain about what was happening but did not express consent to these actions. Mr. Bland then proceeded to climb on top of her and engage in sexual intercourse. As she became more awake, she realized what was happening as he pulled out and ejaculated on her stomach. He cleaned himself and went back to sleep, never speaking to Ms. McMullan. Ms. McMullan could not go back to sleep and proceeded to take the dog for a walk. When she left in the morning, Mr. Bland was still asleep in her bed. Following this incident, in shock and suffering from anxiety due to this pattern of events, Ms. McMullan never spoke about what happened.

On February 21, 2024, Ms. McMullan arrived at work at 7:30 a.m. and Mr. Bland arrived at the same time walking behind her. Mr. Bland asked Ms. McMullan to join him in the conference room. When Ms. McMullan went into the conference room, Mr. Bland followed her in, turned off the cameras and locked the conference room door. Mr. Bland then pushed Ms. McMullan up against the wall, pinning her arms over her head and started to kiss her face and neck. Ms. McMullan pushed him away, telling him to stop and left the office. Shortly after, Ms. McMullan received a text message from one of the other SFE employees, "JP Denise", advising that she would be at the office soon. Ms. McMullan waited until she saw JP Denise walk into the office before going back. She did not want to be alone with Mr. Bland in the office because at this point, she had no idea what he was capable of and did not want to be alone with him in the office. Later in the day, Ms. McMullan was approached by one of the corporate trainees who expressed discomfort and highlighted concerns about the workplace culture after an incident involving the California SFE employees and Mr. Bland being romantically involved with one of the corporate trainees which had led to an uncomfortable confrontation. It is believed that IMG was on notice of Mr. Bland's behavior and had chosen to ignore it.

On February 24, 2024, Ms. McMullan advised Carissa Catalfamo VP for IMG that these issues pertaining to Mr. Bland in the office was making her physically sick and she had started to suffer from anxiety attacks. Ms. Catalfamo denied any knowledge of the incident but said she would talk to Mr. Bland and get to the bottom of it. Ms. Catalfamo further stated to Ms. McMullan that this wasn't the first time Mr. Bland has been sexually inappropriate with a girl from work, that he has

a track record of messing with the women in his department and that when you deal with someone like Mr. Bland, he always wins.

Mr. Bland continued to send Ms. McMullan sexually explicit messages throughout the month, despite Ms. McMullan repeatedly telling him she only wanted a professional relationship.

On April 19, 2024, a conference call was held between Ms. McMullan, Mr. Bland and Carissa Catalfamo, the VP of IMG to discuss how to improve communications. During the call, Carissa expressed that she was disappointed that Jeremy, Ms. McMullan and Carlos Linares, the COO of IMG never sat down to discuss the issues in the office. After the conference call, Mr. Bland attempted to talk to Ms. McMullan about personal matters. When Ms. McMullan refused, Mr. Bland abruptly became irate and began yelling at Ms. McMullan and during this tirade, Mr. Bland communicated to Ms. McMullan that he was terminating her contract and told her to leave immediately. When Ms. McMullan attempted to call Carissa Catalfamo, VP of IMG, to raise her concerns about the incident involving her termination by Mr. Bland and his inappropriate conduct, Mr. Bland took the phone out of her hand and hung up. Ms. McMullan was told to clean out her desk and leave the premises. At this point, Ms. McMullan, having viewed herself as having been constructively discharged due to Mr. Bland's action and the hostile work environment, responded by saying that she quit, and she left. Following this incident, Ms. McMullan attempted to reach out to corporate management for IMG, but she was ignored, and her corporate email was deactivated and her GroupMe messages were erased.

From the beginning of her employment to her termination, Ms. McMullan was subjected to sexual harassment which was abusive and created a hostile work environment. She was sexually assaulted twice by Mr. Bland and when she refused to engage in his sexually inappropriate conduct, Mr. Bland retaliated by terminating her contract. Ms. McMullan endured this offensive conduct from Mr. Bland, a person in management or a supervisor, and it clearly became a condition of her continued employment. Furthermore, the conduct was so severe or pervasive that it created a work environment that was intimidating, hostile, and abusive. These acts were in violation of Title VII of the Civil Rights Act of 1964 and The Pennsylvania Human Relations Act (PHRA) as well as in violation of many of the common law tort claims in Pennsylvania.

# EXHIBIT 2

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Philadelphia District Office**
801 Market St., Suite 1000
Philadelphia, PA 19107
(267) 589-9700
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/03/2026

**To:** Bridget McMullan
2723 Bethlehem Fields Way
Bethlehem, PA 18015

**Re:** McMullan v. Img Corporation
EEOC Charge No: 530-2025-00181

EEOC    Representative    and    Legal Unit
telephone number:

(267) 589-9707

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 530-2025-00181.

On behalf of the Commission,

Digitally Signed By:Karen McDonough
02/03/2026
Karen McDonough
Deputy District Director

**Cc:**
Emanuel Kataev (for Respondent)

Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.ccoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://ccoc.arkcasc.com/foia/portal/login (this is the preferred method). You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 530-2025-00181 to the District Director at Karen McDonough, 801 Market St Suite 1000, Philadelphia, PA 19107.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 530-2025-00181 to the District Director at Karen McDonough, 801 Market St Suite 1000, Philadelphia, PA 19107.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.